UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JANE DOE 1, JANE DOE 2, JANE DOE 3,     :
and JANE DOE 4,
                                        :
              Plaintiffs,                    CIVIL ACTION NO.
                                        :
       -against-
                                        :
IOANNIS FOUKAS, aka JOHN FOUKAS,        :    COMPLAINT

              Defendant.                :    JURY TRIAL DEMANDED
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

     Plaintiffs, Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4 ("Plaintiffs"),[1] by and through their counsel, The Legal Aid Society and Dechert LLP, for their Complaint against Defendant Ioannis Foukas, aka John Foukas ("Defendant"), respectfully allege upon knowledge as to themselves and their acts, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

     1.    Plaintiffs, all women, were victims of labor trafficking, in or affecting international commerce, as defined by the Victims of Trafficking and Violence Protection Act of 2000 (the "TVPA").

     2.    Defendant engaged in a years-long scheme of psychological warfare to coerce Plaintiffs into performing over nine years of unpaid and/or underpaid labor, individually, for his benefit.  Starting in or around 2008 and continuing through the end of 2017, Defendant cut Plaintiffs off from society, controlled their finances, tracked their every move, and subjected Plaintiffs to verbal, physical, and emotional abuse and manipulation.  Defendant not only

---

[1] Plaintiffs have filed a motion to proceed by pseudonym contemporaneously with this Complaint.

dominated Plaintiffs psychologically and financially, but constantly made them fear for their health and safety.  This scheme allowed Defendant to hold Plaintiffs within the Eastern District of New York and exploit them for unpaid and/or underpaid labor in violation of the TVPA.

3.      Defendant met Jane Doe 1, the first Plaintiff he exploited, in or around 2008 when he housed her at 1651 W. 2nd Street, Brooklyn, New York 11223 ("the 1651 House").

4.      Defendant rented apartments at the 1651 House to foreign students and temporary workers, mostly Russian women.

5.      In or around 2010, Jane Doe 2 and Jane Doe 4 both moved into the 1651 House with Defendant and Jane Doe 1.

6.      In or around the summer of 2012, Jane Doe 3 moved into the 1651 House.

7.      While he lived with Plaintiffs, Defendant manipulated and coerced Plaintiffs into performing unpaid labor for him in addition to paying him rent to live in the 1651 House.  These tasks included cleaning the 1651 House and Defendant's other properties, giving Defendant massages, and performing maintenance work at the 1651 House and Defendant's other properties.

8.      While he lived with Plaintiffs, Defendant manipulated and coerced Plaintiffs into giving him significant amounts of money, including funds that Defendant promised to invest for Plaintiffs but instead spent solely for himself.

9.      Defendant manipulated and coerced Plaintiffs to keep them emotionally and financially dependent on him.  Defendant controlled Plaintiffs' movements, severely restricted their communications with friends and family, and dictated where and when they worked. Defendant further required that Plaintiffs inform him of their whereabouts at all times.

10.     At all times while living with Plaintiffs, Defendant verbally, physically, financially, and/or sexually abused Plaintiffs.

11.     In or around early 2014, Defendant coerced Plaintiffs to form a company (the "LLC") with him.  From then on, Defendant manipulated and coerced Plaintiffs into contributing tens of thousands of dollars and hours of unpaid labor into what Defendant claimed was part of the LLC's functions, although Defedant used a significant amount of the money on his own expenses.

12.     Furthermore, while Plaintiffs and Defendant each held equal shares in the LLC, upon information and belief, Defendant never invested any of his own money into it.  However, Defendant  kept much of the revenue made through the LLC for himself.

13.     At no time did Defendant pay Plaintiffs the profits due to them from the LLC or pay them for their labor.

14.     In or around summer 2014, Defendant coerced Plaintiffs to move with him from the 1651 House to 180 Brighton 10th Street, Brooklyn, New York 11235 ("the 180 House").

15.     In or around December 2017, all Plaintiffs escaped Defendant and moved out of the 180 House.

16.     In 2018, Plaintiffs filed a state court lawsuit against Defendant to dissolve the LLC, recoup the profits from the LLC that Defendant had withheld from them, and dissolve their relationship with Defendant.

17.     In or around June 2019, a New York judge issued an order enjoining Defendant from entering the premises of any building owned by the LLC, collecting any rent, or talking to tenants.  Upon information and belief, Defendant has violated the order, including by communicating with tenants and convincing prospective buyers to not purchase the properties.

The judge also agreed that the Plaintiffs could sell their interest in the LLC if they found buyers. However, Defendant continued to pursue frivolous defenses and delay proceedings in an unconscionable manner.

18.      Defendant's years-long scheme of control, manipulation and extortion of Plaintiffs' funds and labor continues to affect each Plaintiff.  Defendant still causes Plaintiffs to fear for their safety.

## **PARTIES**

19.      Defendant Ioannis Foukas, a/k/a John Foukas, is, upon information and belief, a United States citizen who resides at 31 Brighton 3rd Walk, Brooklyn, NY 11223.

20.      Plaintiff Jane Doe 1 currently resides in New York, New York.  She has resided in the State of New York since in or around June 2008.  Jane Doe 1 was a victim of Defendant's years-long scheme to coerce her and other women into, among other things, financing and otherwise supporting Defendant's real estate projects, performing unpaid labor, and submitting to Defendant's domination and control of every aspect of their lives.

21.      Plaintiff Jane Doe 2 currently resides in New York, New York.  She has resided in the State of New York since in or around June 2009.  Jane Doe 2 was a victim of Defendant's years-long scheme to coerce her and other women into, among other things, financing and otherwise supporting Defendant's real estate projects, performing unpaid labor, and submitting to Defendant's domination and control of every aspect of their lives.

22.      Plaintiff Jane Doe 3 currently resides in New York, New York.  She has resided in the State of New York since in or around May 2010.  Jane Doe 3 was a victim of Defendant's years-long scheme to coerce her and other women into, among other things, financing and

otherwise supporting Defendant's real estate projects, performing unpaid labor, and submitting to Defendant's domination and control of every aspect of their lives.

23.     Plaintiff Jane Doe 4 currently resides in New York, New York.  She has resided in the State of New York since in or around June 2010.  Jane Doe 4 was a victim of Defendant's years-long scheme to coerce her and other women into, among other things, financing and otherwise supporting Defendant's real estate projects, performing unpaid labor, and submitting to Defendant's domination and control of every aspect of their lives.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States.  In addition, this Court has jurisdiction under 18 U.S.C. §§ 1591 and 1595, which authorize civil actions for violations of the trafficking provisions of the Victims of Trafficking and Violence Protection Act of 2000.

25.     This Court has personal jurisdiction over Defendant.  Defendant has resided within the District since at least 1989, all of the allegations arise out of events within the District, and Defendant continues to reside within the District.

26.     Venue is proper in this District under 18 U.S.C. § 1391(b) because the allegations arise out of events and actions that occurred within this District.

## FACTUAL ALLEGATIONS

### I.     Trafficking in Persons

27.     Trafficking in persons, described as "modern day slavery," "affects every region and every country in the world."  (*See* U.S. Dep't of State, Trafficking in Persons Report, at 1–2 (June 2011) ("TIP 2011").)

28.     Human traffickers most frequently prey on "those who have become empowered enough to aspire to a better life but have few good options for fulfilling those aspirations."  (*Id.* at 24.)  Often using "subtle forms of fraud and coercion that . . . prevent a person from escaping compelled servitude," traffickers trick, coerce, or win the confidence of their victims, "exploit[ing] their victims' trust and confidence in their own ability to succeed," and "coerc[ing] them into using their lives and freedom as collateral to guarantee a better future."  (*Id.* at 24-25.)

29.     Victims are often lured with false promises of good jobs and better lives, only to suffer "appalling working conditions, little or no pay, and intimidation or violence" and are "held in service through psychological manipulation or physical force."  (*Id.* at 7, 24, 38.)

30.     Human trafficking is a transnational criminal enterprise, generating billions of dollars each year. (*See* U.S. Dep't of State, Trafficking in Persons Report, at 13–14 (June 2005) ("According to the U.S. Federal Bureau of Investigation, human trafficking generates an estimated $9.5 billion in annual revenue."))

31.     To combat trafficking, the United States, along with 142 other nations, has ratified the United Nations' Protocol to Prevent, Suppress, and Punish Trafficking in Persons.  (TIP 2011 at 2.)

32.     In 2000, Congress enacted the TVPA to combat trafficking in persons for the purpose of forced labor and forced prostitution by punishing traffickers and compensating the victims.  *See* Pub. L. No. 106-386, 114 Stat. 1464 (2000).

33.     The TVPA provides a civil remedy for victims of sex and/or labor trafficking.  *See* 18 U.S.C. § 1595.

## II.     Defendant's Trafficking Enterprise

34.     From approximately 2008 to 2017, Defendant Ioannis Foukas held Plaintiffs, all young women who had recently arrived in the United States from abroad, into involuntary servitude to provide labor, services, and capital for his benefit in violation of 18 U.S.C. §§ 1589(a) and 1590(a).  Defendant also used this scheme to sexually abuse Plaintiffs.

35.     Defendant further induced Plaintiffs into forming an LLC with him by, among other things, fraudulently representing to Plaintiffs that they would earn profits from the LLC, that he would share those profits with them, and that these investments would enable them to achieve financial "freedom."

36.     Plaintiffs believed and relied on these fraudulent misrepresentations.

37.     In addition, Defendant forced Plaintiffs to perform a variety of labor and service tasks for Defendant, including, but not limited to, cleaning, shoveling snow, moving furniture, and sorting recyclable materials from the garbage on various properties owned by Defendant, as well as providing frequent massages to Defendant.  Defendant did not compensate Plaintiffs for carrying out any of the labor and service tasks.  In addition, Defendant forced and/or coerced each Plaintiff to dance at nightclubs to earn money that he required that they contribute to the LLC.

38.     Defendant also forced Plaintiffs to provide him with cash, open credit cards to purchase items for him using those lines of credit, and take out loans to benefit Defendant.

39.     Upon information and belief, Defendant used significant amounts of the money Plaintiffs provided to him solely for his benefit, such as to pay off mortgages on other properties that he owned outside of the LLC.

## III.    Jane Doe 1

40.     Jane Doe 1 was born and raised in Russia.

41.     In or around June 2008, Jane Doe 1 arrived in New York from Russia.

42.     Jane Doe 1 met Defendant on the first day she arrived in New York.  She received Defendant's contact information from friends who knew that Defendant rented rooms to foreign students and workers.

43.     Defendant induced Jane Doe 1 to move into the the 1651 House by representing to her that this apartment was only for women.  Jane Doe 1 paid Defendant approximately $350-400 per month for rent.  Defendant housed Jane Doe 1 in an apartment with two other female students.  Jane Doe 1 had to sleep on the couch in the apartment living room, as there were no available beds or bedrooms in which she could stay.

44.     Jane Doe 1 shortly thereafter learned that Defendant was also living in the 1651 House.  Defendant stayed in the apartment bedroom with his girlfriend, while Jane Doe 1 and another woman slept in the living room.

45.     After Jane Doe 1 moved into the apartment, Defendant and his girlfriend broke up, and Defendant's girlfriend moved out of the apartment.

46.     In or around early 2010, Jane Doe 1 and Defendant began dating.

47.     At some time in 2011, Jane Doe 1 and Defendant moved into a different apartment at the 1651 House.  They lived at this address until approximately June 2014.  During this time, Jane Doe 1 paid Defendant approximately $500-600 for rent per month.

48.     In or around June 2014, Jane Doe 1 and Defendant moved to the 180 House.  Jane Doe 1 paid Defendant approximately $700 per month in rent.  Jane Doe 1 lived there until she and the other Plaintiffs escaped from Defendant in or around December 2017.

49.     In or around April 2011, Jane Doe 1 married Defendant.  They began the process of divorcing in approximately August 2017.  Their divorce was finalized in or around December 2017.

## IV.    Jane Doe 2

50.     Jane Doe 2 was born and raised in Russia.

51.     Jane Doe 2 first came to the United States on or around June 21, 2009.

52.     When Jane Doe 2 first arrived in the United States, she attempted to find employment at various restaurants in Brighton Beach, Brooklyn, but was unable to find continuing employment.  Starting in or around late 2009, she worked as a dancer at various clubs.

53.     In or around September 2010, Jane Doe 2 met Jane Doe 1 at the nightclub where they both worked as dancers.  Jane Doe 1 told Jane Doe 2 that Defendant was a friend of hers who was helping her get credit cards, go to school, and otherwise get set up in New York.

54.     Jane Doe 2 met Defendant shortly thereafter, in or around September 2010, when he came to pick up Jane Doe 1 from a social visit with Jane Doe 2.  Defendant offered Jane Doe 2 a ride home as well.  The next day, Defendant and Jane Doe 1 took Jane Doe 2 out for lunch, and Defendant told Jane Doe 2 that he wanted to help her.

55.     About a week after meeting Defendant, Jane Doe 2 was attacked in her apartment building.  She called Defendant, and he offered her a place to stay at the 180 House.  Jane Doe 2 paid Defendant approximately $600 a month in rent.

56.     In 2011, Jane Doe 2 moved into the 1651 House with Defendant and Jane Doe 1. Defendant required Jane Doe 2 to pay him approximately $600 a month in rent at that residence as well.  Eventually, Jane Does 3 and 4 moved into 1651 House as well.

57.     All parties lived at the 1651 House until spring or summer of 2014, when they moved back to the 180 House.  There, Jane Doe 2 paid Defendant approximately $700 per month for rent.  Jane Doe 2 lived at the 180 House until she and the other Plaintiffs escaped from Defendant in or around December 2017.

**V.     Jane Doe 3**

58.     Jane Doe 3 was born and raised in Russia.

59.     Jane Doe 3 first came to the United States on or around May 2010.

60.     In or around January 2012, Jane Doe 3 married.  The relationship quickly soured, however, and, that summer, she moved into a safe house to escape her abusive husband.  She also met with an immigration attorney who recommended she reach out to Defendant and Jane Doe 1 because Defendant rented rooms to students.

61.     Jane Doe 3 received a call from Defendant in or around June 2012, and she spoke with Defendant and Jane Doe 1 for around thirty minutes.  She told Defendant and Jane Doe 1 about her abusive husband, and Defendant asked Jane Doe 3 to meet him immediately.

62.     Jane Doe 3 met Defendant, and he took her to a meal at the diner where Jane Doe 4 worked.  At the diner, Defendant asked Jane Doe 3 questions about her personal life and financial savings.  Defendant brought Jane Doe 3 back to his home at 1651 House and explained she must stay there because living alone is dangerous.

63.     Jane Doe 3 agreed to rent space on the second floor of the 1651 House where Defendant, Jane Doe 1, and Jane Doe 2 lived.  Jane Doe 3 paid Defendant approximately $400 a month to sleep on a couch in the living room.  In or around July 2012, Jane Doe 3 moved downstairs into a room with Jane Doe 4 and began paying Defendant approximately $500 per month in rent for a bed in the same room.

64.     After a few months of living at the 1651 House, Jane Doe 3 was sitting in the living room, and Defendant asked Jane Doe 3 to sit on his lap, facing him, and straddling him with her legs.  She denied him, saying it was "weird."  Defendant asked her why she felt it was weird, and, upon his insistence, Jane Doe 3 disclosed to Defendant that she had been abused as a child.  Defendant responded by trying to convince Jane Doe 3 that it would not be weird for

her to sit on him, and what was actually "weird" was her insecurity about her past.  Defendant told Jane Doe 3 that he would help her overcome her past by teaching her how to "love herself."

65.     Jane Doe 3 lived in the 1651 House until approximately June 2014, when she and other Plaintiffs moved to the 180 House.  There, Jane Doe 3 paid Defendant approximately $700 per month for rent.  Jane Doe 3 lived at the 180 House until she and the other Plaintiffs escaped from Defendant in or around December 2017.

**VI.     Jane Doe 4**

66.     Jane Doe 4 was born and raised in Russia.

67.     Jane Doe 4 first came to the United States on or about May 2009.

68.     In or around September 2009, Jane Doe 4 received Defendant's contact information from a coworker who knew that Defendant rented rooms to foreign students and workers.  Jane Doe 4 rented a room from Defendant for about a week before returning to Russia to complete her Master's Degree in English and German education.

69.     Jane Doe 4 came to New York and Defendant told her that she could rent a room from him.  Defendant told Jane Doe 4 that he would help her get set up in New York , but she had to follow his one rule:  she could not have a boyfriend.

70.     Jane Doe 4 returned to New York on or about June 10, 2010.

71.     Beginning on the day Jane Doe 4 moved to New York, Defendant housed Jane Doe 4 at the 1651 House.  She rented a room on the first floor of the house with Jane Doe 3.  Jane Doe 1 and Jane Doe 2 lived on the second floor with Defendant.  From approximately June 2010 through 2012, Jane Doe 4 paid Defendant approximately $350 per month for rent.  From 2012 through 2014, Jane Doe 4 paid Defendant approximately $500 per month for rent.

72.     Jane Doe 4 lived at the 1651 House until approximately June 2014, when she and other Plaintiffs moved to the 180 House.  At the 180 House, Jane Doe 4 paid Defendant approximately $700 per month for rent.  Jane Doe 4 lived there until she and the other Plaintiffs escaped from Defendant in or around December 2017.

**VII.   By Engaging in a Protracted Scheme of Psychological, Verbal, Emotional, Sexual, and Physical Abuse, Defendant Manipulated Plaintiffs into Supplying Him With Labor and Money in Violation of 18 U.S.C. §§ 1581, 1589, 1590 and 1593A.**

**A.  Defendant Exerted Total Control over Plaintiffs' Lives.**

73.     As early as 2010, Defendant began to exert control over Plaintiffs' lives, finances, communications, and movements.  By 2017, this control was so complete that Defendant completely dictated Plaintiffs' lives.

74.     In or around summer 2010, Defendant began requiring Jane Doe 4 to report her income to him.

75.     In or around September 2010, shortly after meeting Jane Doe 2, Defendant began requiring Jane Doe 2 to notify him of her location at all times.

76.     In or around 2011, Defendant began monitoring Jane Doe 2's income.

77.     By approximately September of 2011, Defendant was requiring all Plaintiffs to notify him of their whereabouts at all times.  He forced them to ask for his permission before going anywhere.  He also began to force them to follow his every instruction.  If Plaintiffs failed to do so, he would scream and verbally abuse them.

78.     Defendant exerted total control over what Plaintiffs ate.  He required that they all eat  the same things and at the same time.  He forbade them from going to the local Russian grocery stores in Brighton Beach, where they could meet other Russian speakers and buy familiar food.  At one point, Defendant dictated that Plaintiffs could not eat salt.  Another time, he told them that they could only eat onions and carrots.  But Defendant never followed the diets he

prescribed for Plaintiffs.  He explained this by saying that he was "on God's level," and did not

need to restrict his diet, while they needed to in order to better themselves.  He told Jane Doe 2,

who was a vegetarian, that she needed to eat meat in order to "break her ego."

79.     From approximately September 2014 through November 2017, Defendant forced

Plaintiffs to watch motivational videos about life and business.  On some instances, he told

Plaintiffs that spirits had spoken to him about the videos they needed to see, and other times he

said that God had spoken to him about the need to find these videos.  Plaintiffs estimate that they

were required to watch these videos for approximately five hours per day, almost every day of

the week, for three years.  Defendant stated that they needed to watch the videos to become more

successful and "love themsevles."

80.     These videos centered primarily on personal development, motivation, and

business.  However, some discussed spirituality, sexuality, psychology, and conspiracy theories.

Defendant used these videos to aggrandize himself, guilt Plaintiffs into obeying him, and foment

mistrust among the women.  Defendant would show Plaintiffs videos about Jesus and tell them

that they were betraying him, just like Jesus was betrayed.  Defendant showed them videos about

polygamy and nudism and had them discuss how these ways of living were natural and

preferable.  Another time, Defendant showed Plaintiffs a video about narcissistic personality

traits and told them that it was a video about Jane Doe 3.

81.     Defendant used these motivational videos as a way to further control Plaintiffs

lives.  Defendant would force Plaintiffs to wake up early after working all night—permitting

Plaintiffs to sleep on average, fewer than six hours—in order to begin watching videos.

82.     Defendant conditioned Plaintiffs' access to food, sleep, and use of the restroom

on watching all of the videos he selected.  He would not let them eat breakfast before watching

these videos, because they would "get sleepy" and be unable to pay sufficient attention.  Jane

Does 2 and 4 stated that Plaintiffs had to ask permission to use the restroom while watching the

videos and sometimes Defendant would not let them go at all.  Defendant would justify the

conditions he imposed on them by stating that he was teaching Plaintiffs self-discipline.

83.     Defendant used the LLC he and Plaintiffs formed as another mode of exerting

control over their lives.  He would call meetings of the LLC which could last multiple hours.  He

would call these meetings by stating that he wished to discuss business with Plaintiffs, but would

instead often use the meeting time to either discuss personal issues he had with each Plaintiff in

order to manipulate them, or otherwise emotionally abuse them.

84.     During one approximately five-hour business meeting, Plaintiffs told Defendant

that they wished to exit the LLC and go their separate ways.  In response, Defendant dissuaded

Plaintiffs and  asked them to answer "what's next?" for them if they left the LLC.  When Plaintiffs

did not answer in a way that was pleasing to him, Defendant forced them to go outside and ask

passersby what they should do.  For several hours, Defendant monitored Plaintiffs as they

approached strangers and asked them "what should we do next?"

**B.  Defendant Isolated Plaintiffs From Their Communities to Ensure Their
   Psychological, Economic, and Social Dependence on Him.**

85.     Through a scheme of emotional abuse and manipulation, Defendant ensured that

Plaintiffs stayed isolated from the influence of anyone other than him.

86.     Defendant would not let any of the Plaintiffs speak in Russian, their native

language.  On some occasions, when he caught them speaking Russian, he would make them pay

him $100.  Defendant told Plaintiffs that they should not speak Russian because it would make

them remember who they were and where they came from, which would hinder their ability to

succeed in the United States.  As a result, Plaintiffs rarely spoke to each other in Russian,  nor

did they converse with other Russians in their area.  Defendant restricted Plaintiffs' abilty to venture out and make connections within the Russian-speaking community in New York.

87.     Defendant also forbade Plaintiffs from speaking to others at their places of employment.  He would say that they should never talk to others, because others were jealous of their successes; or he would say that their employers did not like employees talking to each other.

88.     In or around 2011, Defendant forced Jane Doe 2 to break up with her boyfriend and to not pursue further romantic relationships.  Defendant told Jane Doe 2, "No boyfriends. Show me how you can follow instructions."

89.     At or around this time, Defendant began to restrict Plaintiffs' communications with their families.  He told Plaintiffs that they should call their parents less so they could learn to "be independent."  Defendant told Jane Doe 2 that she needed to "train her mother to not be so needy" and that by distancing herself from her mother, Jane Doe 2 was showing her mother that she was busy and successful.  Defendant also told Jane Doe 2 to lie about her whereabouts to her stepfather, and told Jane Doe 2 that her stepfather was "not family" and a "random man."

90.     In 2012, Defendant began to cut Jane Doe 1 off from her friends.  He insisted that he accompany her whenever she went out, forbade her from seeing friends without him, and told Jane Doe 1 that her friends were bad influences.  As a result, Jane Doe 1 became increasingly isolated from friends outside of Defendant's sphere of influence.

91.     On more than one occasion, Defendant locked the door when Jane Doe 4 wanted to go for a walk and would not let her leave the house.

**C.  Defendant's Verbal and Emotional Abuse of Plaintiffs**

92.     Starting in or around 2014, Defendant's control over Plaintiffs' lives increased further.  He would require them to text him when they woke up, any time they left the house, and when they left for work.  When they failed to do so, he would threaten and verbally abuse them.

93.     Defendant would manipulate Plaintiffs by fueling dissent among them.  In or around 2014, after Plaintiffs and Defendant moved to the 180 House, Jane Doe 3 asked Defendant where the money she and the other Plaintiffs had been giving him was going.  Jane Doe 3 expressed that she mistrusted Defendant and asked him to prove to her that the funds she and the other Plaintiffs were giving him were being used to pay down the mortgage on the 180 House, as they agreed (*see* Paragraphs 135, 163-64, 167-68, 173-74, 178-79, *infra*).  Defendant began to verbally abuse Jane Doe 3, telling her she was a "spoiled apple" who would "ruin the whole bunch."

94.     After that incident, Defendant called a meeting of all Plaintiffs and two other women who were then involved in plans to form the LLC.  He asked them to vote on how much they all trusted Jane Doe 3, because she caused too much trouble and "caused turmoil" to Defendant.  Defendant forced Plaintiffs to rate Jane Doe 3 on a scale of 1-10 of trustworthiness. Fearing further emotional abuse from Defendant, Plaintiffs said they would rate Jane Doe 3 a 3 on a 1-10 scale of trustworthiness.  This conduct caused Jane Doe 3 to doubt herself and experience significant loss of self-esteem.

95.     When Plaintiffs would inquire about the status of renovations and/or construction on the properties that the LLC owned, Defendant would scream at them.  He would tell them "never question me, just follow me," and that they needed to follow him "without thinking."

96.     Defendant insisted to Plaintiffs that he had healing powers.  He told Jane Does 1 and 2 that he had healed his grandmother and had given her the ability to walk again.  He would

force Plaintiffs to listen to him talk about God and watch religous videos.  When Plaintiffs questioned him, he would say that God wanted them with him and that if they disobeyed him, they were "with the devil."

97.    In or around 2016, Defendant started to tell Plaintiffs that he himself was God.

98.    When Plaintiffs questioned Defendant, he would say that they were possessed by the devil.

99.    For approximately a month, Defendant shut the doors and windows to the house that he shared with Plaintiffs and burned sage.  Defendant said that this was to force the devil out of the house.  On one occasion, the smoke filled up the house and Plaintiffs could barely breathe.  Defendant said he would burn down the house with everyone inside if the devil did not leave.  Plaintiffs feared for their lives.

100.    Defendant often threatened Plaintiffs.  He threatened each of them that, if they left the LLC, he would call the authorities on them.  He told them that he would report them to the government authorities and that he would sue them.  He told them that he had set up the LLC so that they could never leave.  Defendant also told Plaintiffs that he would report them to the government if they ever tried to move out of his house.

101.    Defendant threatened Jane Doe 1 that, if she ever left him, he would call her mother and tell her "things that would make her want to commit suicide."  He also threatened to tell Jane Doe 1's family that she was a dancer, or lie and state that she was a prostitute.

102.    Defendant also threatened Jane Doe 2 that he would tell her parents that she was a dancer or a prostitute.  He threatened to tell immigration authorities that she was illegally in the United States to have her deported.  Defendant would taunt Jane Doe 2 by stating that she would never be able to go to the police about him, because she would be deported.

103.    Defendant also threatened Jane Doe 2 by bragging about his connections in a threatening manner.  He would say that "even the Mafia is afraid" of him.  He would also tell Jane Doe 2 stories that a former girlfriend of his had "betrayed" him, and he had "called some guys to rape her and put her in a trunk."

104.    Defendant threatened Jane Doe 3 by stating that he would send a video of her dancing to her family.   He also threatened to call immigration and/or the police and/or government authorities on her.  Defendant also threatened to call her abusive ex-husband and tell him where she was so he could "take revenge on her."

105.    Defendant threatened Jane Doe 4 by stating that he would lie and tell her family and friends that she was a prostitute, and that he would make sure her parents had a heart attack and died.  Defendant also threatened to call immigration to tell them that she was illegal so that they would deport her.

106.    Defendant threatened Plaintiffs by stating that he would call the police and government authorities if they left the business or their home.

107.    In or around December of 2017, Defendant threatened to lock Plaintiffs inside their house and burn the house down with them inside of it "to force the devil out."  This threat prompted Plaintiffs to escape from the house that they shared with Defendant.

108.    After leaving Defendant's house and severing ties with him, Defendant continued to contact Plaintiffs.  Some days, Defendant would call Jane Doe 1 approximately 20 times and text her approximately 15 times.

109.    Defendant would text Plaintiffs messages about their surroundings and whereabouts, making them fear that he was stalking them.  Defendant would text Jane Doe 3

about parking spots nearby when she was moving the car for street cleaning, or text her to turn out the light in her apartment when she was home.

110.   On or around May 12, 2019, after Plaintiffs escaped from Defendant, Jane Doe 1 returned to New York from a vacation.  As soon as she arrived in her apartment, she received a text from Defendant saying "welcome back."  Jane Doe 1 was so frightened that she went to the police and filed a report.

111.   In or around July of 2019, Jane Doe 1 had an order of protection filed against Defendant.

**D.  Defendant's Sexual Abuse of Jane Doe 2**

112.   Defendant coerced Jane Doe 2 into having sex with him by verbally and emotionally abusing her in order to wear down her defenses.  Defendant habitually insulted Jane Doe 2 by critiquing her clothing, body, and all aspects of her appearance.  He would say that she looked like an "idiot," or that she looked "ridiculous" in clothing that she chose.  Instead, he would compel her to wear clothing that he chose for her.  This clothing was old-fashioned, out-of-style, and conservative.  When Jane Doe 2, who appreciated and loved fashion, tried to style this clothing to her liking, Defendant would berate her—often to the point where she would be in tears—by saying that she looked stupid and fat in the clothing she chose.  As a result, Jane Doe 2 began to lose confidence in her appearance and in her sense of self.

113.   In or around 2011, Jane Doe 2 lost her period due to ongoing hormonal issues. Defendant said that he could heal her by having sex with her.  Jane Doe 2 did not want to, and protested that Defendant was married to Jane Doe 1.

114.    Defendant would say that Jane Doe 2 needed to submit to him in order to be "healthy."  Defendant told Jane Doe 2 that she "had to accept it" and that if she did not have sex with him, she would be "rejecting God."

115.    At this point, Jane Doe 2 was working 5-7 days a week as a dancer.  Defendant was in total control of how and where she spent her money.  The medication she was taking for her hormonal issues made her emotional, and she would cry often.  Whenever she cried, Defendant would call her "pussy" and say "strong women don't [cry]."  Jane Doe 2 would cry when Defendant propositioned her for sex, but Defendant would say "you have to accept it." Eventually, Defendant sexually abused Jane Doe 2 for the first time.

116.    After Defendant sexually abused Jane Doe 2, he told her that she needed to continue having sex with him to be healed.  This began a cycle of sexual abuse that lasted until around 2015.  Defendant would go through periods during which he sexually abused Jane Doe 2 daily, leaving her alone for months before the sexual violence began again.

117.    Defendant also told Jane Doe 2 that he was motivated by love to have sex with her.  In the beginning, he would say that this love compelled him to heal her through sexual acts. But after a period of time, Jane Doe 2 began to question Defendant's motives, reject his advances, and fight with him.  After this, Defendant began to tell Jane Doe 2 that they needed to have sex so that he could "prepare her for her future husband," who he would find for her because he knew "what kind of man she needed," so that she would not be cheated on.  He would tell her that without this, she would be unsuccessful and alone in the future.

118.    Defendant would tell Jane Doe 2 that he was her family.  As such, he knew her better than anyone else, and he acted out of love for her.  He told her that this is why he could find her a boyfriend.  He also told her that this is why it was good for him to have sex with her—

because he was doing it out of familial love.  He even told her that if his own mother wanted to have sex with a random person, he would offer himself to her so that "she could know me better" and so she would not give herself to someone who did not love her.

119.    Defendant began telling Jane Doe 2 that she needed to "stay home," "be naked," and allow him to "touch her anywhere."  He said that the sex was "for her, not for him," and that if she ever questioned his motives, she should "feel guilty."

120.    When sexually abusing Jane Doe 2, Defendant would also verbally abuse her. Defendant would say that Jane Doe 2 was stupid, fat, and that she was a piece of meat and men would cheat on her.  He would scream at her phrases like "you're fat and full of cellulite," "you're disgusting," and "you're nothing."

**E.  Defendant's Sexual Abuse of Jane Doe 3**

121.    In or around the end of 2013, Defendant began offering Jane Doe 3 "healing massages" when she was feeling ill.  During these massages, he would require her to remove all her clothing.   These massages could last two hours long.   Defendant said that he, unlike professional massage therapists, acted with "unconditional love" that could heal any ailments by removing negativity from the body.  Defendant told Jane Doe 3 that she needed him to remove this negativity from her body through these massages, and that it would take him multiple sessions for him to accomplish this.  The goal, he said, was for her to "love herself," because her lack of self-love was the reason she "attracted" her abusive ex-husband.

122.    After Defendant forced Plaintiffs to vote on whether or not they trusted Jane Doe 3 (*see* Paragraphs 90-91, *supra*) Jane Doe 3 asked Defendant how she could change her behavior in order to be a better friend and become more trustworthy.  Defendant said that she needed to "follow him 100 percent" at all times.  He told her that he would "be testing" her, in ways that

were "sometimes weird," but it was necessary for her to "better herself."  Over the next months, Jane Doe 3 expended extra effort in order to please Defendant and show him that she was trustworthy and that she loved herself.

123.    In or around 2015, Jane Doe 3's mother came from Russia to visit her.  She stayed at the 180 House with Plaintiffs and Defendant.  Defendant extended extreme hospitality towards Jane Doe 3's mother.  From this, Jane Doe 3 felt indebted to Defendant for his hospitality, and felt more affirmed in staying with him.  She felt "like [Defendant and the other Plaintiffs] were her American family."

124.    Once Defendant saw how happy Jane Doe 3 was, he told her that she was finally ready for "the final test."  He needed to give her "unconditional love, and [she] needed to receive it."  Defendant began massaging Jane Doe 3 and then sexually assaulted her.

125.    Defendant began doing this on a regular basis, saying that this was the only way she could start loving herself again.

126.    During this time, Defendant would also force himself into Jane Doe 3's twin bed and sleep next to her, telling her he needed her energy in order to calm his anger towards other girls.  Jane Doe 3 noticed that when Defendant slept with her and/or assaulted her, he would not verbally abuse the other Plaintiffs.  Jane Doe 3 also noticed that when she tried to refuse Defendant's sexual assault, Defendant would retaliate by increasing his verbal abuse of the other Plaintiffs on the following day.  Jane Doe 3 began to feel as though she needed to submit to Defendant's abuse in order to keep peace in the house.

127.    Defendant also began to psychologically abuse Jane Doe 3 by telling her that her problems were rooted in the facts that "nobody loved her in her life" and that she did not "feel loved enough."   Defendant  told  Jane  Doe  3  that  he  was  the  only  one  who  loved  her

unconditionally, and that he needed to give her this love so that she could "become a whole person."  Defendant also claimed that the sexual contact was necessary to "heal" Jane Doe 3 of her past traumas.

### F.  Defendant's Physical Abuse of Plaintiffs

128.    In or around 2015, Defendant became more violent towards Plaintiffs.  He would frequently lose his temper, throw objects at Plaintiffs, and break items near them.

129.    In or around 2015, during an argument, Defendant physically hit Jane Doe 2 in the head and screamed at her that she was stupid.  Jane Doe 2 remembers thinking that it was her fault that Defendant hit her.

130.    In or around 2016, Defendant hit Jane Doe 2 again because she was crying.  Defendant yelled at her that she needed to be stronger.

131.    In or around 2016 or 2017, Defendant was screaming at Jane Doe 2 during an argument.  He broke a door, shattering a mirror on a wardrobe, causing Plaintiffs to fear for their physical safety.  Jane Doe 2 began to have a panic attack, and she fell to the floor crying and hyperventilating.  She thought that Defendant was going to kill her and the other Plaintiffs.

## VIII.    Defendant Manipulated Plaintiffs into Performing Unpaid Labor and Making Fraudulent Financial Investments Related to Their LLC

132.    In or around May 2014, Defendant suggested forming a joint venture with Jane Does 1–4 and two other women[2] to invest in real estate.  Defendant would act as the principle of a jointly-owned LLC.

---

[2] The two other women lived with Defendant and Plaintiffs at this time.  Shortly after the LLC was formed, these other women decided to leave the group.  According to Jane Doe 2, they were quite young and were not bringing in as much cash as Jane Does 1–4, and so, according to Jane Doe 2, Defendant considered it "more convenient to kick them out" of the LLC.

133.   All parties formed the LLC in 2014.  Each member had an equal ownership stake in the LLC.  Notwithstanding that, Defendant did not contribute any capital.

134.   In order to earn more money for their joint venture, Defendant convinced Plaintiffs to work together as dancers at the same club.  To ensure that Plaintiffs worked as promised, Defendant arranged to have a driver bring Plaintiffs to and from the club.  Defendant received a referral fee for introducing Plaintiffs to the driver.

135.   Between approximately January and April of 2014, Plaintiffs began giving money to Defendant.  Defendant told Plaintiffs that he needed to pay off the mortgage on the 180 House, and once he did, he would transfer title of the 180 House to the LLC.  Defendant told Plaintiffs that in order to do this, he needed them to each pay him $5,000 per month.  Plaintiffs complied.

136.   Jane Doe 1 began giving Defendant money for the LLC in or around March of 2014.  Defendant said that this money would be used for down payments on rental properties that the LLC would purchase.

137.   Jane Doe 2 began giving Defendant money for the LLC in mid-2014.

138.   Jane Doe 3 began giving Defendant money for the LLC in or around May of 2014.

139.   Jane Doe 4 began giving Defendant money for the LLC in or around May of 2014. She paid through in or around December 2014.

140.   At some point in 2014, Defendant took Jane Doe 3 to Home Depot and Lowe's to open credit cards in her name.  Defendant used those cards to purchase supplies even though Jane Doe 3 did not authorize him to make these purchases.  Instead, Defendant would sometimes forge Jane Doe 3's name when signing for those purchases.

141.   In or around July 2014, Defendant and Plaintiffs moved into the 180 House.  Defendant required that Plaintiffs pay him rent to live in the 180 House on top of the $5000 per

month payments they were making.  Plaintiffs each paid Defendant approximately $700 per month to live at the 180 House.

142.    In or around December 2014, Jane Does 1, 2, and 4 became unable to continue paying these monthly sums to Defendant.  Defendant then required Jane Doe 3 to lend the other three Plaintiffs money at 0% interest without any documents to record the amounts loaned.

143.    On December 22, 2014, the LLC purchased its first property at 196 Brighton 10th Street, Brooklyn, NY 11235.  The purchase price was $450,000.  The LLC, representing seven people, purchased the home with $200,000 down and a loan of $250,000 at 8% interest from a private lender who is not a party to this suit.  The LLC was represented by an attorney who was a friend of the Defendant.  This attorney recommended that Plaintiffs retain separate counsel, but Defendant refused to permit this.

144.    Plaintiffs paid the mortgage on this property, which totaled approximately $5,069 per month.

145.    In or around summer 2015, the LLC purchased its second property at 188 Brighton 10th Street, Brooklyn, NY 11235.  The purchase price was approximately $450,000. Each Plaintiff invested different amounts in this property, putting $250,000 down and taking out a balloon mortgage for the remaining $200,000.  Plaintiffs made payments on this mortgage. Payments were initially approximately $1,066 per month, but then tapered off to approximately $833 per month.

146.    In or around the summer of 2015, the two women who had initially entered the LLC with Defendant and Plaintiffs left the LLC.  Plaintiffs bought them out of the LLC, paying one woman $40,387 and the other $16,044.16.  Plaintiffs paid this by depositing personal checks from their accounts into the LLC's accounts, and using that to pay the women.  Defendant

received a 20 percent share in the LLC along with Plaintiffs, despite having contributed no money to it.

147.    In or around 2015, Jane Does 2 and 4 had run out of money and told Defendant that they could not keep investing in the LLC.  Defendant required Plaintiffs to take out credit cards, which Defendant used to purchase items for the LLC's properties, as well as the properties he owned independently without alerting any of the Plaintiffs of his actions.  Jane Doe 3 estimates that the monthly expenses that Defendant incurred on her credit card ranged between $2,000 and $3,000.

148.    In or around January 2017, Defendant forced Plaintiffs to purchase a third property located at 200 Brighton 10th Street, Brooklyn, New York, 11235 for $400,000 through the LLC.  For a down payment, Plaintiffs invested a total of approximately $153,000 of their own money, and Defendant invested an additional $97,000.  Upon information and belief, this $97,000 was comprised of the money that they had been paying Defendant for the 188 House.  Additionally, Plaintiffs signed a $150,000 promissory note to pay the seller at Defendant's insistence, although Defendant did not himself sign this note.  Plaintiffs agreed to pay for the house over a three-year period.

149.    The $150,000 promissory note is still outstanding.  Defendant has stated that he has no intention of paying it.

150.    Before investing in the above property, Defendant informed Plaintiffs that the LLC was required to pay off a balloon mortgage on the 188 Brighton 10th Street property.  Defendant instructed Plaintiffs to give him sufficient cash to pay off this mortgage.  Jane Does 1, 2 and 4 borrowed money from Jane Doe 3 and, together, Plaintiffs gave approximately

$140,000 in cash to Defendant over two occasions.  However, Defendant never paid off the mortgage.

151.    Starting in or around 2016, Jane Doe 1 began to feel like she and the other Plaintiffs were spending "too much" on construction costs for each property the LLC owned. Jane Doe 1 estimates that Plaintiffs had spent approximately $100,000 on construction costs at this time, and Jane Doe 4 estimates that Plaintiffs were paying  Defendant approximately $5,000 per week for varying months.

152.    Defendant also required Plaintiffs to use their earnings to pay contractors who worked on properties owned either by Defendant or by the LLC.  Defendant would threaten them by telling them stories of how one contractor was "crazy," how he had almost killed his wife, and that he kept a gun, so they "don't want to play games" with him.  If Plaintiffs resisted giving their earnings to this contractor, Defendant would threaten them by stating that he would tell the contractor that they were keeping him from receiving his money.  This caused Plaintiffs to fear for their safety.

153.    After Plaintiffs moved out of Defendant's house to live independently in or around December of 2017, Defendant began to use rents collected from the properties owned by the LLC to support his separately held properties and for his own personal use.  Defendant told tenants not to pay rent to Plaintiffs.

154.    In 2018, Plaintiffs filed a state court action against Defendant to collect their shares of profits from the LLC and formally dissolve their ties to Defendant.

155.    Jane Doe 1 was told by the tenants that Defendant falsely told them that Plaintiffs were prostitutes and that they had stolen $500,000 from Defendant.

## IX.  Defendant Constantly Manipulated Plaintiffs into Providing Him Financial Support

156.     Defendant manipulated each Plaintiff into giving him additional money, which he converted to his own use.

### G.  Jane Doe 1's Other Payments to Defendant

157.     In or around 2008, shortly after Jane Doe 1 moved to New York, Defendant helped her obtain a job as a dancer at a New Jersey nightclub.  Defendant knew other dancers there, including his then-girlfriend, as well as an agent who drove the dancers to and from the club.

158.     Starting in or around 2009–2010, after Jane Doe 1 and Defendant began dating, Defendant began manipulating Jane Doe 1 to give him money.  He told her that he would put the cash that she earned as a dancer into an account he controlled, where she could earn interest from the money.  In or around 2009 or 2010, Jane Doe 1 gave Defendant about $10,000 for this purpose.  Subsequently, Jane Doe 1 gave Defendant another approximate $10,000.  He told her that once she needed the money, she would be able to withdraw it.  She asked him multiple times for this money, but he refused to give it to her.  Finally, he told her that he had put it into a joint business account he held with an associate, that this associate had sued Defendant, and the business account had been frozen.  Defendant said that this associate stole Jane Doe 1's money.  Jane Doe 1 was never able to recover the $20,000 she had given to Defendant.

159.     Because Defendant required Jane Doe 1 to let him know of her location at all times, required her to follow all of his instructions, and forbade her from seeing anyone outside of his circle of friends, she felt unable to resist his demands.  Jane Doe 1 also felt indebted to Defendant for housing her when she first came to New York City.  She saw Defendant as a pillar of her community.

160.     Starting in or around 2009, Defendant and Jane Doe 1 agreed that she would give him money that she earned from working so that he could begin investing.  Jane Doe 1 would

give Defendant money every month for this purpose, ranging from "a couple hundred" to "a couple thousand" dollars in each payment.

161.    In or around June 2014, when Plaintiffs and Defendant were preparing to move from the 1651 House to the 180 House, Jane Doe 1 paid approximately $10,000 to buy furniture for these two properties for Defendant.

162.    Jane Doe 1 ultimately paid Defendant approximately $115,000 to be used for the mortgage of the 180 House.

163.    However, Defendant never used the money to pay for the mortgage at the 180 House, and he never put the house in the LLC's name.

164.    Jane Doe 1 also paid approximately $700 per month in rent to live at the 180 House.

**H.  Jane Doe 2's Financial Investments**

165.    Jane Doe 2 ultimately paid Defendant approximately $42,500 to be used for the mortgage of the 180 House.

166.    However, Defendant never used the money to pay for the mortgage at the 180 House, and he never put the house in the LLC's name.

167.    Jane Doe 2 also paid approximately $700 per month in rent to live at the 180 House.

**I.  Jane Doe 3's Financial Investments**

168.    In the beginning of 2015, Defendant required Jane Doe 3 to give him her entire savings for "safekeeping."  In or around 2016 or 2017, Jane Doe 3 discovered that Defendant had taken about $10,000 from her savings.  He never paid this money back to Jane Doe 3.

169.     Defendant convinced Jane Doe 3 to loan out money to the other Plaintiffs, saying that they were her "family" and she had to take care of them "as a family."   In fall 2017, Defendant required Jane Doe 3 to provide him $10,000 to buy a new car for him and Plaintiffs to use.  He represented that he would pay her back with proceeds made from the sale of an older car.  He sold this other car and received sufficient funds to repay Jane Doe 3, but never transferred the $10,000 he owed her out of his account.

170.     Defendant manipulated Jane Doe 3 out of all of her financial savings, comprising over $200,000 over the course of their relationship.

171.     Jane Doe 3 ultimately paid Defendant approximately $95,000 to be used for the mortgage of the 180 House.

172.     However, Defendant never used the money to pay for the mortgage at the 180 House, and he never put the house in the LLC's name.

173.     Jane Doe 3 also paid approximately $700 per month in rent to live at the 180 House.

**J.  Jane Doe 4's Financial Investments**

174.     In 2014, Defendant coerced Jane Doe 4 into dancing at a New Jersey nightclub. Jane Doe 4 was required to tell Defendant how much money she made each night.

175.     In or around 2014, Defendant coerced Jane Doe 4 into paying $1,500 for bedbug remediation at one of his properties.

176.     Jane Doe 4 ultimately paid Defendant approximately $46,000 to be used for the mortgage of the 180 House.

177.     However, Defendant never used the money to pay for the mortgage at the 180 House, and he never put the house in the LLC's name.

178.    Jane Doe 4 also paid approximately $700 per month in rent to live at the 180 House.

## X.    Defendant Forced Plaintiffs to Perform Additional Unpaid Labor

179.    Each Plaintiff was further required to perform extensive unpaid labor for Defendant.   Defendant coerced Plaintiffs to perform this labor by using manipulative and controlling means, including emotional duress, threatening their health and safety, and subjecting them to humiliation and shaming.  Tasks which Plaintiffs performed together are below.  Tasks related to each individual Plaintiff follow.

180.    In or around approximately February 2013, Defendant got into an accident that required him to be hospitalized.  Defendant required Jane Does 1, 2, and 3 to nurse him and take care of his personal effects while he was in the hospital.  These tasks included buying him food, cooking, feeding him, giving him massages, helping him get dressed and undressed, and otherwise attending to his needs.  Jane Doe 1 estimates she spent approximately 150 hours performing these tasks.  Jane Doe 2 estimates that she spent approximately 240 hours performing these tasks.  Jane Doe 3 estimates that she spent approximately 20 hours total performing these tasks.

181.    In or around the summer of 2014, Plaintiffs were forced to perform significant work at each of the properties that Defendant owned.  Plaintiffs spent at least approximately 20 hours per week cleaning at the 1651 House and 10 hours each per week cleaning at the 180 House.  Defendant told Plaintiffs that in order for them to become successful real estate investors, they had to prove that they could "learn the basics" by performing these tasks.  When Plaintiffs resisted, Defendant would lose his temper and tell them things like, "it doesn't matter why you're doing this, just do it," and "it doesn't matter if you understand, just do it."

182.    In the summer of 2016, Defendants forced Plaintiffs to clean the apartments at the 1651 House.  Each Plaintiff spent approximately 15 hours per week completing these tasks.

183.    In spring 2017, Defendant forced Plaintiffs to clean his property at 31 Brighton 3rd Walk, Brooklyn, NY 11235.  Each Plaintiff spent approximately 10 hours performing this work.

184.    Each Plaintiff was required to shovel snow in front of the properties that Defendant owned.  Jane Doe 1 and Jane Doe 3 shoveled snow for two seasons, spending approximately 20 hours and 24 hours total, respectively, on this task.  Jane Doe 2 and Jane Doe 4 each shoveled snow for three seasons, working approximately 25 hours per season each.

**K.  Jane Doe 1's Unpaid Labor**

185.    Jane Doe 1 performed unpaid labor in addition to that previously described above.

186.    Starting in 2008, Jane Doe 1 began shoveling snow around the 1651 House for Defendant.  In or around 2013, she started shoveling snow in front of all of his properties.

187.    From approximately September 2008 to September 2014, Jane Doe 1 performed housekeeping tasks and worked as a personal assistant to Defendant.  She spent an estimated 9 hours per week performing this work.  She was never paid.

188.    Starting in or around 2014, Defendant began requiring Jane Doe 1 to separate the garbage at different properties that he owned, especially at the 180 House, where Jane Doe 1, Defendant, and Jane Does 2–4 were then living.  Defendant also began requiring Jane Doe 1 to restore the apartments at the 1651 House after the tenants moved out.  This involved cleaning the apartments, which were sometimes infested with bedbugs.  The amount of unpaid labor that Defendant forced Jane Doe 1 to perform varied week by week.  Jane Doe 1 estimates that she spent, on average, 10–20 hours a week performing these tasks for Defendant.

189. From about September 2014 to November 2017, Defendant forced Jane Doe 1 to move and park his cars for him. Jane Doe 1 estimates that she spent, on average, 2 hours per week performing these tasks.

190. Defendant also required Jane Doe 1 to move and organize his personal items. Jane Doe 1 estimates that she spent, on average, 10 hours per week performing these tasks.

191. After nine months working at the New Jersey club, Jane Doe 1 quit because she was working too many hours while going to school full-time. Jane Doe 1 told Defendant that she wanted a job during daytime hours. Defendant insisted that she would not be able to make the same amount of money at a "regular" job. Defendant insisted that Jane Doe 1 begin working at another club.

192. The amount of unpaid labor that Defendant forced Jane Doe 1 to perform varied by week and by season. Jane Doe 1 estimates that she spent, on average, 11 hours a week performing housekeeping tasks for Defendant and parking Defendant's car for Defendant and 25 hours each winter shoveling snow from 2014–2017.

193. When they were married, Defendant would also require Jane Doe 1 to accompany him on trips abroad to see his family in Greece. Defendant would say that these were vacations, but in reality, he would require Jane Doe 1 to spend her time cleaning his relatives' houses, tending to his parents' gravesites, and performing other household chores without pay.

194. Defendant also required Jane Doe 1 to work as a dancer at nightclubs. Defendant helped Jane Doe 1 procure a job dancing at a New Jersey club, shortly after she arrived in New York.

**L.  Jane Doe 2's Unpaid Labor**

195. Jane Doe 2 performed unpaid labor in addition to that previously described above.

196.     In 2011, Jane Doe 2 began performing unpaid housework for Defendant at the house they shared with the other Plaintiffs.  Later that year, Defendant began to require her to do more work around other properties that he owned.  This included sorting garbage, shoveling snow, and cleaning out apartments after tenants moved out.  Jane Doe 2 estimates that she was performing two to three hours of work per day for Defendant in 2011.

197.     From approximately March 2011 to August 2017, Jane Doe 2 performed housekeeping and cooking work for Defendant.  She estimates that she spent four hours per week performing these tasks.

198.     From approximately January 2012 through approximately July 2017, Defendant forced Jane Doe 2 to give him frequent massages at all hours of the day.  Jane Doe 2 estimates that she spent 3 hours per week giving Defendant massages from January 2012 through August 2014.  From September 2014 to July 2017, Jane Doe 2 estimates that she spent 1 hour per week giving massages to Defendant.

199.     From January 2012 through July 2017, Defendant forced Jane Doe 2 to perform personal assistant tasks for him.  Jane Doe 2 estimates that she spent 2 hours per week performing these tasks.

200.     In 2015, Jane Doe 2 moved into the 180 House with Defendant and the other Plaintiffs.  She estimates that, at this point, she spent the majority of the time that she was not at her own job working for Defendant.  This work included manual labor around the properties that Defendant owned, as well as frequent massages Defendant demanded she give him.

201.     Defendant also required Jane Doe 2 to work as a dancer in nightclubs.  In or around 2014, Defendant told Jane Doe 2 that she needed to quit her job working as a translator

and return to working at the New York nightclub.  Jane Doe 2 had been working as a translator
for about two years, since 2012.

202.    Defendant told Jane Doe 2 that, in order to invest in the LLC, she needed to return
to dancing.  He would pressure her into dancing by saying that she needed to do it in order to be
financially free and provide for her family.  He would also scream and insult her when she said
that she wished to continue working as a translator.

**M. Jane Doe 3's Unpaid Labor**

203.    Jane Doe 3 performed unpaid labor in addition to that previously described above.

204.    From approximately June 2012 through the summer of 2014, Defendant forced
Jane Doe 3 to walk his dog, tend to it, and clean up after it both inside and outside of the house.
Jane Doe 3 estimates that she spent approximately four hours per week performing this task.

205.    From approximately September 2014 to June 2017, Defendant forced Jane Doe 3
to pick up Defendant's mail from all of the properties that Defendant owned.  Jane Doe 3
estimates that she spent approximately 30 minutes per week performing these tasks.

206.    Defendant also coerced Jane Doe 3 to work as a dancer in nightclubs.  In or around
2012, Defendant required Jane Doe 3 to begin dancing in clubs that he had selected.

**N.  Jane Doe 4's Unpaid Labor**

207.    Jane Doe 4 performed unpaid labor in addition to that previously described above.

208.    Defendant required Jane Doe 4 to work as a dancer at nightclubs.  In or around
August of 2014, Defendant convinced Jane Doe 4 to quit her job at the restaurant where she was
working, and lie to her boss by stating that it was because she was going back to school.
Defendant then helped Jane Doe 4 procure a job dancing at a New Jersey club, where Jane Doe
4 began working full-time.

209.    After one year of working at the New Jersey club, Defendant told Jane Doe 4 that she had to change job locations because she could make more money at another club.  Defendant helped Jane Doe 4 procure a job dancing at a New York club.

210.    At this time, Plaintiffs all danced at the New York club.  Defendant told Plaintiffs when they would work, would not allow them to take time off even if they requested, and falsely claimed that their dancing income would solely be used to pay for the houses owned by the LLC.

## XI.    Defendant's Continuing Damage to Plaintiffs' Lives

211.    As a result of their time with Defendant, Plaintiffs have suffered emotional, financial, and physical injuries.

212.    Defendant's abuse of Plaintiffs' funds and credit left them in significant debt. They are unable to pay the promissory note on 188 Brighton 10th Street and they are in default on the mortgage on 196 Brighton 10th Street.

213.    Each Plaintiff has been required to expend funds related to Defendant's frivolous delays and court appearances related to their state court litigation.  As of today, Plaintiffs have outstanding legal bills totaling over $65,000.

214.    Each Plaintiff has been unable to rebuild her savings after Defendant depleted them.  Each Plaintiff faces extreme financial insecurity as a result of Defendant's manipulations.

215.    Each Plaintiff stuggles emotionally and psychologically due to their experiences with Defendant.  Plaintiffs struggle with feeling like they have to wear masks because of how often Defendant manipulated them, required them to acquiesce to his will, and forbade them from contacting others.  Plaintiffs feel uncomfortable telling people about their experiences, and feel unable to connect to people.  Plaintiffs feel like they need to lie, and can never be authentic with

other people.  As a result of Defendant's actions, each Plaintiff sought counseling and/or cotinues

counseling and/or therapy to cope with their struggles.

216.    Because Defendant isolated Plaintiffs for almost a decade, Plaintiffs have lost

significant opportunities to gain skills, find employment in fields they wish to, and create new

social networks outside of Defendant's control.

217.    Each Plaintiff still lives in constant fear of Defendant.

### FIRST CLAIM FOR RELIEF
**(Forced Labor in Violation of 18 U.S.C. §§ 1589, 1595)**

218.    Plaintiffs allege and re-allege the paragraphs above as if fully set forth herein.

219.    Defendant knowingly obtained Plaintiffs' labor or services by means of force,

threat of force, means of serious harm, threats of serious harm, means of abuse, or threatened

abuse of law or legal process, and a scheme, plan, or pattern intended to cause Plaintiffs to believe

that they or another person would suffer serious harm in violation of 18 U.S.C. § 1589(a).

220.    Defendant knowingly benefitted financially and/or by receiving anything of value

by harboring and/or maintaining Plaintiffs in violation of 18 U.S.C. § 1589(a)(2).

221.    Plaintiffs are authorized to bring this civil claim against Defendant under the civil

remedies provision of the William Wilberforce Trafficking Victims Protection Reauthorization

Act of 2008, 18 U.S.C. § 1595.

222.    Defendant's scheme and associated actions caused Plaintiffs injuries and

damages.

### SECOND CLAIM FOR RELIEF
**(Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.§. §§ 1590, 1595)**

223.    Plaintiffs allege and re-allege the paragraphs above as if fully set forth herein.

224.    Defendant knowingly recruited, harbored, transported, provided, and/or obtained Plaintiffs for labor or services in violation of 18 U.S.C. § 1590.

225.    Plaintiffs are authorized to bring this claim against Defendant under 18 U.S.C. § 1595, which provides for a civil cause of action.

226.    Defendant's scheme and associated actions caused Plaintiffs injuries and damages.

**THIRD CLAIM FOR RELIEF**
**(Unpaid State Minimum Wages and Overtime Wages in Violation of The New York Labor Law, N.Y. Lab. Law §§ 650 *et seq*.)**

227.    Plaintiffs allege and re-allege the paragraphs above as if fully set forth herein.

228.    The minimum wage on and after January 1, 2007, is $7.15.  N.Y. Labor Law § 652.

229.    As pleaded *supra*, Defendant required Plaintiffs to perform significant amounts of work for him, in areas such as property maintenance and personal care.  Defendant failed, however to pay Plaintiffs the minimum wage for this work, in violation of New York law.

**FOURTH CLAIM FOR RELIEF**
**(Negligent Infliction of Emotional Distress)**

230.    Plaintiffs allege and re-allege the paragraphs above as if fully set forth herein.

231.    Defendant owed a duty of reasonable care to Plaintiffs while Plaintiffs resided in Defendant's home and in Defendant's employ.

232.    Jane Doe 1 and Jane Doe 4 suffered repeated instances of psychological and emotional abuse from Defendant.

233.    Jane Doe 2 and Jane Doe 3 suffered repeated instances of psychological, sexual, and emotional abuse from Defendant.

234.    Defendant breached his duty of reasonable care to Plaintiffs.

235.    Plaintiffs suffered severe emotional distress as a result of the abuse they endured in the Defendant's home.

## FIFTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

236.    Plaintiffs allege and re-allege the paragraphs above as if fully set forth herein.

237.    Defendant repeatedly insulted and psychologically abused Plaintiffs. This abuse occurred over the course of several years. The conduct was often extreme, and it included repeatedly attacking Plaintiffs' physical appearance, challenging their self-worth, leveraging Plaintiffs' past traumas and insecurities to dominate and coerce Plaintiffs, and threatening Plaintiffs will physical harm. Defendant acted well beyond the bounds of normal human decency on a continuous and systemic basis by forcing Plaintiffs to adhere to his personal code of conduct and by severely restricting their communications with their families and the outside world.

238.    As a result of Defendant's outrageous and extreme behavior, Plaintiffs were put in fear for their safety. They suffered because of this behavior and continue to suffer extreme emotional distress, embarrassment, and humiliation.

## SIXTH CLAIM FOR RELIEF
### (Assault)

239.    Plaintiffs allege and re-allege the paragraphs above as if fully set forth herein.

240.    Defendant's action and words, as pleaded above, were intended to cause harmful and/or offensive contact with Plaintiffs and/or the apprehension of imminent harmful and/or offensive physical contact without Plaintiffs' consent.

241.    Defendant's actions were malicious and cruel.

242.    As a direct and proximate result of Defendant's actions and words, Defendant placed Plaintiffs in apprehension of imminent harmful and/or offensive physical contact.

243.    As a direct and proximate result of Defendant's actions and words, Plaintiffs have suffered, and continue to suffer, emotional distress, embarrassment, and humiliation.

## SEVENTH CLAIM FOR RELIEF
### (Battery)

244.    Plaintiffs allege and re-allege the paragraphs above as if fully set forth herein.

245.    Defendant's actions, as set forth above, were intended to cause offensive contact with Plaintiffs without Plaintiffs' consent.

246.    Defendant's actions directly and proximately caused Plaintiff to suffer offensive contact without Plaintiffs' consent.

247.    As a direct and proximate result of Defendant's actions and words, Plaintiffs have suffered physical harm as well as severe emotional distress, embarrassment, and humiliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant as follows:

1) awarding Plaintiffs compensatory damages in an amount to be proven at trial;

2) awarding Plaintiffs punitive damages in an amount to be proven at trial;

3) awarding Plaintiffs their actual expenses of litigation, including attorneys' fees; and

4) granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

November 12, 2020

Respectfully submitted,

**DECHERT LLP**

By: *s/ Mauricio A. España*_____
Mauricio A. España
Alyssa Christine Clark (Pro Hac Pending)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Tel. (212) 698-3500
Mauricio.Espana@dechert.com
Alyssa.Clark@dechert.com


**THE LEGAL AID SOCIETY**
Sumani Lanka
Carmela Huang
199 Water Street, 3rd Floor
New York, New York 10038
Telephone: (212) 577-3300

*Attorneys for Plaintiff*s